# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### March 1, 2011 Session

## STATE OF TENNESSEE v. OSAYAMIEN OGBEIWI

**Direct Appeal from the Criminal Court for Shelby County**
**No. 06-01475     Lee V. Coffee, Judge**

---

**No. W2010-00117-CCA-R3-CD  - Filed July 29, 2011**

---

The defendant, Osayamien Ogbeiwi, was convicted by a Shelby County Criminal Court jury of first degree premeditated murder and was sentenced to life imprisonment. On appeal, he argues that: (1) the trial court erred in denying his request for a continuance so he could obtain a mental evaluation; (2) the trial court erred in denying his motion to suppress; (3) the trial court erred in denying his objections concerning the admission of the store surveillance video; (4) the trial court erred in not requiring the State to develop legally sufficient corpus proof; (5) the trial court erred in overruling his objections to the State's closing argument; (6) the evidence was insufficient to sustain his conviction; (7) the trial court erred in charging the jury that it must first acquit the defendant before considering lesser offenses; and (8) the trial court erred in charging the jury with an inconsistent verdict form. After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER and CAMILLE R. MCMULLEN, JJ., joined.

Michael E. Scholl, Memphis, Tennessee, for the appellant, Osayamien Ogbeiwi.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; William L. Gibbons, District Attorney General; and Glen Baity and Doug Carriker, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

This case relates to the defendant's shooting of a Citgo gas station convenience store

clerk, Ali Abdiaziz, for which he was indicted on charges of first degree felony murder and first degree premeditated murder.

## State's Proof

Officer Bennie Washington with the Memphis Police Department testified that he was dispatched to a Citgo gas station convenience store on South Perkins Road in Memphis during the early morning hours of December 20, 2005, in response to an armed robbery where the clerk was possibly injured. Officer Washington was the first person on the scene and, when he entered the store, saw the "clerk positioned behind the counter, and he had been shot multiple times." Officer Washington called for an ambulance, and it arrived shortly thereafter.

Tina Watkins testified that she was a regular customer of the Citgo convenience store in December 2005, and, on December 20, she stopped in at the store around 2:20 a.m. When she pulled in, she noted that the victim was not visible from the window like usual and that store merchandise appeared to have been knocked over. Watkins walked slowly into the store and saw the floor littered with merchandise and the victim on the floor with his back against the wall. Upon seeing blood coming from the victim's mouth and ear, Watkins left the store and called 911. When shown a picture of the victim, Watkins identified the deceased as the store clerk and said that she knew him by sight but not by name.

On cross-examination, Watkins acknowledged that the store was small and that upon entering, a person was almost right at the front counter. She said that the victim was about five feet away from her when she went inside. Watkins never saw whether the victim kept a gun in the store, and he never mentioned a gun in their conversations.

Sergeant David Sloan with the Memphis Police Department Felony Response Unit testified that he arrived to the scene at the Citgo store on December 20, 2005, around 3:00 a.m. Sergeant Sloan talked to Watkins and the crime scene officer. Sergeant Sloan observed what he believed to be blood inside the store near one of the walls, near the doorway inside the store, and outside the store in the parking lot. He observed two different calibers of shell casings, forty and forty-five, inside the store on the floor near the counter. Outside the store, Sergeant Sloan saw an item of jewelry and a hotel key card.

Sergeant Sloan testified that the store manager came to the store and allowed Sergeant Sloan to view the surveillance video. The relevant time on the video showed three males dressed in dark clothing with their hoods pulled up and trying to cover the lower portion of their faces. After viewing the tape, Sergeant Sloan gave it to Officer Payment who tagged it into evidence.

Officer Chester Striplin with the Memphis Police Department testified that he converted the store's VHS surveillance recording to a DVD format. Officer Striplin created two DVDs: one showed four cameras and ran at regular speed, and on the other he "slowed some of the sections of the video down, and . . . broke the cameras into individual cameras." Both videos were played for the jury.

On cross-examination, Officer Striplin acknowledged that the date stamped on the screen of the surveillance video indicated March 6, 2005, as the date it was taken. The video also indicated a date of December 19, 1972. Officer Striplin hypothesized that the discrepancy could be due to the store owner not resetting the clock for daylight savings time or recording over a used tape which could lead to "a little bleed over[.]" He admitted that the screen also showed a time of 7:13 p.m. On redirect examination, Officer Striplin stated that it was not unusual for a store's tapes to show a date that did not coincide with the actual date of an occurrence.

Kimberly Dwayne Jeans, an employee of Guardsmart Security assigned to The Regional Medical Center ("The Med") in Memphis, testified that he was working in the shock trauma unit during the early morning hours of December 20, 2005, when "a civilian - a male black . . . came through the ambulance area and let us know that he had someone in the car who had been shot." The person seeking medical attention was in a green Ford Crown Victoria that was parked in the ambulance bay, and there were two other African-American men inside the car. Medical personnel removed the injured man from the car and took him inside for treatment. Jeans asked the man who had initially alerted to the situation if he would come inside and give them more information, but the man, instead, got into his car and left.

Officer Ashton Britton with the Memphis Police Department testified that he was called to the trauma area of The Med during the early morning hours of December 20, 2005, with regard to a gunshot victim. He explained that anytime the hospital received patients with "gunshot wounds, stabbings, wounded parties that's been in fights – if a crime has been committed," the hospital would call the police to take a report of the situation. Officer Britton said that gunshot wounds were typically reported as aggravated assaults, so he took a report listing the injured man, identified in court as the defendant, as the victim. Officer Britton said that his report indicated that the defendant arrived at the hospital at 2:35 a.m. At some point, medical personnel alerted Officer Britton that they had collected the defendant's clothing and personal items in a clear plastic bag. Officer Britton "just watched" the items and did not "tag" them as evidence.

Officer David Payment with the Crime Scene Unit of the Memphis Police Department testified that he was called to the scene at the Citgo convenience store during the early

morning hours of December 20, 2005. Officer Payment photographed and prepared a sketch of the entire crime scene as well as generated a written report. On his sketch of the outside, Officer Payment noted a gold ring, an earring backing, a bullet hole, a spent bullet, a possible bullet impact, and areas of possible blood. On his sketch of the inside, Officer Payment noted a baseball cap, four spent forty-caliber shell casings, a spent forty-five caliber shell casing, two spent bullets, and areas of possible blood. Officer Payment also collected relevant evidence around the scene, both inside and outside, including samples of the areas of possible blood, and placed them in the property room. In addition, Officer Payment retrieved a VHS security tape from the Citgo store.

On cross-examination, Officer Payment acknowledged that the name of the victim he recorded on the envelope containing the blood samples was "Derrick LaTodd," the name of the victim listed on the trial jacket was "Abidrahama Yusuf," and the name listed on the indictment was "Abdiaziz Ali."

Officer Gerald Paige with the Crime Scene Unit of the Memphis Police Department testified that he was dispatched to The Med around 4:00 a.m. on December 20, 2005, to "[c]ollect clothing that could have been from the victim of a crime." Officer Paige met a detective at The Med who advised him that he needed to collect some clothing. He then saw a member of medical personnel who gave him a plastic bag containing "socks, shoes, [and] some gray pants" that belonged to the defendant. When Officer Paige took the clothing to the property room, he observed that the gray pants had what appeared to be blood on them. Officer Paige noted that the pants had been cut by medical personnel to facilitate treatment.

Officer Paige testified that, in addition to the clothing, he was also given other items of the defendant's by a member of medical personnel. These other items included, among other things, a gun holster, a green New Testament Bible with a baptismal certificate inside of it made out to the defendant, a City of Memphis Credit Union teller card bearing the defendant's name, some keys, and assorted papers. At The Med, Officer Paige also collected items belonging to the victim, including his wallet which contained, among other things, a Tennessee photo identification for Ali Abdiaziz, a Virginia photo driver's license for Ali Abdiaziz, a Bank of America debit card for Ali Abdiaziz, a permanent resident card bearing the name of Ali Abdiaziz, a social security card for Ali Azizharra Ali, a Family Care Health Plan card for Ali Abdiaziz, a Western Union gold card for Ali Abdiaziz, a check from Night and Day Food Mart made out to Ali Abdiaziz, a U.S. Transportation Task Force card for a task force officer named James Maledo, a social security card for Hason Safia, and a social security card for Hason Mohamed, a social security card for Ali Fara Ali, a gold check card from Bank of America issued to Yusuf Abidrahamn, a The One Club card issued to Yusuf Abidrahamn, and a Western Union gold card issued to Hiloee Zucharia. The victim also had nearly $1000 in his wallet.

-4-

On cross-examination, Officer Paige admitted that there was no money among the personal effects of the defendant that he collected at the hospital. Officer Paige also acknowledged that the victim had several pieces of identification in his wallet that were not in his name. He counted six identifications in the name of Ali Abdiaziz and seven identifications, including four social security cards, that were in other various names. The Tennessee and Virginia identifications that were in the name of Ali Abdiaziz listed his date of birth as May 15, 1967. However, Officer Paige acknowledged that the date of birth listed for the victim on various envelopes of body fluids collected at the Citgo crime scene was different than the date listed on the identifications.

On redirect examination, Officer Paige noted that only three of the identifications collected from the victim had photographs on them, and each of those was in the name of Ali Abdiaziz and appeared to have the same person in the photographs.

Dr. Martin Croce, the medical director for the trauma center at The Med, testified that he was working in the trauma unit on December 20, 2005, and treated a patient who arrived at the hospital by private car around 2:30 a.m., suffering from two gunshot wounds. Dr. Croce later learned the patient to be the defendant. In order to treat the defendant, Dr. Croce cut off the defendant's clothing.

Sergeant Andrew Kjellin with the Felony Response Unit of the Memphis Police Department testified that he responded to The Med around 3:20 a.m. the morning of the incident and was advised that the victim had been pronounced dead at 3:10 a.m. Sergeant Kjellin then went to check on another patient, an African-American male in his mid-twenties. The patient would not respond to Sergeant Kjellin's attempt to ascertain his identity, so Sergeant Kjellin took the patient's photograph, which was admitted into evidence.

Officer James Luckett, who worked in the Homicide Bureau of the Memphis Police Department at the time of the incident, testified that he was the lead investigator on this case. Officer Luckett went to the scene at the Citgo the following morning and learned that the store clerk had been shot and was deceased and that the defendant was possibly involved. Officer Luckett went to The Med to obtain a thumb print from the defendant and then went a second time to talk to the defendant, who was considered a suspect "[d]ue to the circumstances of him arriving at The Med."

At this second visit, Officer Luckett identified himself to the defendant and advised him of his rights, but the defendant did not agree to talk to the officer. The defendant also declined to provide a DNA swab. Officer Luckett obtained a search warrant and returned to the hospital where he procured a DNA swab of the defendant. Officer Luckett delivered

the swab kit to the Tennessee Bureau of Investigation ("TBI") lab for testing. He also delivered fluid samples and "some gray pants" that he retrieved from the property room, and an FTA card from the morgue that contained the victim's blood samples, to the TBI lab for testing.

Officer Luckett testified that he was at the scene at the Citgo two days after the incident and was given a bullet slug and bullet jacket that had been found by "two gentlemen . . . while they were cleaning up," as well as a box of forty-five caliber rounds. The box contained forty bullets, although it held fifty bullets. Officer Luckett believed that the bullets belonged to the store owner. Officer Luckett explained that he took all these items to the TBI for analysis because blood had been found outside the door of the store, and they wanted to make a DNA comparison.

On cross-examination, Officer Luckett admitted that he had never received training for taking a buccal swab sample and this was his first time for doing so. Officer Luckett also acknowledged that he later learned that some portion of the buccal swab evidence collected from the defendant was misplaced in the property room.

On redirect examination, in answering an omitted question, Officer Luckett testified that the pants he took to the TBI lab for processing were tagged as belonging to the defendant. He stated that it was significant that the pants were gray because the suspect in the surveillance video was wearing gray pants.

Sergeant William Merritt with the Homicide Division of the Memphis Police Department testified that he was in the property room on August 27, 2007, when he spoke to Lieutenant Barham about a piece of property that had been returned from the TBI lab after forensic testing but had not been assigned a property receipt number. Sergeant Merritt stated that he received an envelope from Lieutenant Barham that was closed with an evidence label from the TBI lab. Inside the envelope were two saliva samples that had been taken from the defendant for DNA testing. However, Sergeant Merritt did not open the sealed inner envelope that contained the actual swab. Sergeant Merritt then gave the evidence a property receipt number.

On cross-examination, Sergeant Merritt testified that he had no idea why it was listed that the evidence was recovered from "4566 Cottonwood, Memphis, Tennessee" on the evidence permanent assignment receipt unless a clerk mistakenly listed the defendant's address as the recovery address.

Special Agent Donna Nelson, a forensic scientist with the TBI Crime Lab in the field of serology and DNA, testified that she analyzed eight samples of possible bloodstains found

at the Citgo and compared them to known samples from the defendant and victim. One of the samples was blood and matched the defendant's DNA at seven of thirteen areas, but Agent Nelson was not able to get a profile on the remaining areas. Three samples were blood and completely matched the defendant's DNA. Two of the samples were blood and matched the victim's DNA. One sample did not indicate the presence of blood, and on one sample Agent Nelson was not able to get a DNA profile because there either was not enough DNA in the sample or the sample was degraded. She analyzed a stain on the pants collected from the defendant and determined that the stain was the defendant's blood. Once her testing of the evidence was completed, Agent Nelson said that Sergeant Harris with the Memphis Police Department picked the evidence up on March 21, 2006. She said that she did not consider any of the samples she received to be contaminated because contamination would have been evident in her testing.

Dr. Lisa Funte, an assistant medical examiner for Shelby County, testified that the victim's body was received from The Med and assigned an identification number. The autopsy revealed that the victim suffered multiple gunshot wounds, which was the ascertained cause of death. One bullet entered the victim's right shoulder and exited straight out his back; one bullet entered the left side of his chest and exited from the lower right side of his back; and a third bullet entered the victim's right cheek and exited under his chin. The victim's facial wound exhibited stippling. On cross-examination, Dr. Funte acknowledged that the information they received identifying the victim as "Abdiaziz Ali" came from the hospital or the police, not from a family-member identification.

**Defendant's Proof**

The mother of the defendant's children, Demetria Love, testified that both she and the defendant worked in 2005. The defendant had two jobs at the time, and they were not having any financial problems. Love stated that the defendant carried a gun as a condition of his job as a security officer and was licensed to carry it. Not long before the incident in this case, the defendant bought their son a puppy for $1200, which initially upset Love. However, the dog was stolen by one of the defendant's "so-called friends," and the defendant and his friend were in an ongoing altercation over the dog. A few days prior to the incident at the Citgo, the defendant's friend "shot up" Love's car with the defendant and their son inside. Nevertheless, they did not file a police report about the shooting.

Love testified that the defendant told her he was going to get the dog back. The night of the shooting, she heard the defendant arguing on the phone with someone and then he left the apartment, which was unusual for him to do late at night. However, the defendant did not tell her that the reason he was leaving was to get the dog back. Love said that the next time she saw the defendant was in the hospital after he had been shot. Shortly after the

shooting, the defendant went to stay with some friends in Jamaica to heal. When she informed the defendant that there was a warrant for his arrest, he flew home and was arrested coming through customs.

On cross-examination, Love admitted that they did not file a police report about the stolen dog. She said that she only knew the defendant's friend who stole the dog as "Blue," and she did not have independent knowledge, aside from what the defendant told her, that Blue had stolen the dog. However, she heard the defendant arguing on the phone about the dog. Love also acknowledged that they did not file a police report about the shooting of her car even though the shooting evidenced an intent to kill. She had taken photographs of the damaged car but had misplaced them. On redirect examination, Love explained that she did not file police reports because they lived in a "pretty rough" area of town, and she felt that the police did not take complaints from their area seriously.

The defendant elected to testify. He admitted that he was the man seen on the video entering the store and shooting the victim. He said that, since the incident, he had been under the care of a psychiatrist and was taking numerous anti-psychotic medications. He felt bad that the victim had died, noting that there was no reason for him to have lost his life. At the time, the defendant worked as a security guard for two different companies and was licensed to carry the gun used in this offense.

The defendant explained the sequence of events giving rise to the shooting. Sometime before the shooting, the defendant bought an expensive puppy for his son, and it was stolen by "Blue," whom he believed to be a friend. The defendant had several conversations with "Blue" concerning the dog and, two days before the Citgo shooting, went to meet "Blue" to, he presumed, pick up the dog. When he arrived at their meeting location, "Blue" shot at the defendant's car with the defendant and his son inside, so the defendant drove off.

The defendant testified that the night of the Citgo shooting, he had another conversation with "Blue" and, as a result of that conversation, went to get the dog back or have "Blue" pay for the dog. The defendant and two of his friends went to The Memphis Inn, which was approximately one block away from the Citgo, to meet "Blue." They parked at another nearby hotel and walked toward The Memphis Inn. As they were passing an abandoned business on the walk to The Memphis Inn, a person, who appeared to be "Blue," got out of a car parked at the business and started shooting at them. In an effort to take cover from the gunfire, the defendant ran to "the closest place that [he] could get into, and that was the [Citgo] store." Once inside the store, the defendant retrieved his weapon, but the store clerk, the victim, seeing the defendant's weapon, pulled out a gun of his own. The defendant told the victim, "Whoa, whoa, whoa," but the victim shot the defendant in the

foot and then the chest, and the defendant "just returned fire."

The defendant testified that he left the store but then realized that the victim's gun was near his hand, and he did not want the victim to get the gun in his hand. Therefore, the defendant "ran back to get the gun. But [the victim] had the gun in his hand, and [the defendant] grabbed the gun when it went off, boom. When it went off, that's when [the defendant] snatched it out of his hand, and [the defendant] ran out of the store." The defendant said that the round did not hit the victim; the victim had already been shot three times by that point. After the shooting, the defendant ran out of the store because he was scared and wounded, and the two friends that had been with him returned and took him to the hospital.

The defendant testified that after he was released from the hospital, he went to Jamaica to stay with friends of the family because he knew that he "was going to have to deal with this situation eventually, but [he] didn't want to have to come to jail with the bullet holes in [his] leg, in [his] foot, in [his] chest[.]" He said there was no warrant for his arrest when he left for Jamaica, and, upon learning that there was a warrant for his arrest, he made arrangements to return to Memphis and turn himself in. He said that he did not choose to stay in Jamaica because "first of all, [he] felt like [he] had to explain [him]self. Second of all, you know, what happened to the man. And third," he did not want to abandon his family. The defendant denied that he went to the store to commit robbery or to kill the victim.

On cross-examination, the defendant explained that he decided to meet "Blue" to negotiate about the dog although he knew "Blue" to be dangerous because he did not want to look like a "coward," which could lead to further victimization of his family. Asked whether he actually expected "Blue" to return the dog, the defendant said, "I had what I had on me, and I knew that if he shot at me that I was going to be able to shoot back." The defendant maintained that he did not shoot the victim when he walked back in the store after starting to leave. He said that the victim was standing when he shot the victim in the chest even though the medical examiner had testified that the victim's gunshot wound to the chest was at a downward angle. The defendant acknowledged that his handgun carry permit had been a conditional permit and that it had been rescinded at the time of the shooting.

In response to questions from the jury and on redirect examination, the defendant admitted that his and his two friends' faces were covered and hoods pulled up when they entered the store. Asked why, he explained that "[t]hey were already pulled over when we were going to get up with Blue." He elaborated that he believed that "Blue" was going to shoot at him, and he "had on a hoodie because if ["Blue"] had shot at [him], [he] was going to shoot back at ["Blue"]." However, he did not anticipate "Blue" shooting at him the way

he did, and the defendant panicked "because [he] had never been shot at before[.]" The defendant maintained that when he first started to exit the Citgo store after the shooting, the victim was still moving and had his gun in his hand. On recross-examination, the defendant indicated that he already had his gun drawn when "Blue" began to shoot at him.

**Rebuttal Proof**

Lieutenant James Luckett with the Memphis Police Department testified that after learning about the shooting at the Citgo, he and other officers went to the area to see if any surrounding businesses had surveillance videotapes without any success. He said that there were no reports of other shootings in the area that night.

On cross-examination, Lieutenant Luckett acknowledged that there were not many businesses in between the area of The Memphis Inn and the Citgo, and most businesses were closed at 2:00 a.m.

After the conclusion of the proof, the jury deliberated and was unable to reach a verdict on count one of the indictment, the charge of felony murder, and the court declared a mistrial on that count. However, the jury convicted the defendant as charged in the second count of the indictment of premeditated first degree murder. Upon the verdict of the jury, the trial court sentenced the defendant to life imprisonment.

## ANALYSIS

### I. Motion for Continuance

The defendant argues that the trial court erred in denying his request for a continuance for him to obtain a mental evaluation. He asserts that his "mental capacity at the time of the commission of the crime seems to be questionable especially concerning his ability to form the proper mens rea to commit the crime."

The record indicates that on June 12, 2009, defense counsel informed the trial court that he had learned that the defendant was taking anti-psychotic medications and that he wished to have a mental evaluation conducted in order to ascertain whether the defendant had a mental disorder. Defense counsel received approval to hire Dr. Joseph Angelillo, to conduct the evaluation; however, Dr. Angelillo was unable to conduct the evaluation before trial due to his being out-of-town. On July 10, 2009, the defendant asked for a continuance in order to have the doctor conduct the evaluation.

In denying the defendant's request for a continuance, the trial court reviewed the history of the defendant's case from his arrest on June 13, 2006, to the present time. The court noted that the defendant was evaluated after his arrest to determine his sanity and competency to stand trial and was found competent to proceed even though he initially refused to cooperate with the doctor. The court found that there was nothing in the original evaluation that indicated a diminished capacity defense would apply in the defendant's case and that one of the counts of which the defendant was charged, felony murder, required no mental state. The court observed that the case had been continued many times and that the defendant himself had expressed frustration that his case had yet to be tried. The court concluded that it would not be in the best interest of justice and fairness to grant a continuance, but that the defendant could still have the evaluation and the court would review it during the motion for new trial if the defendant was in fact convicted.

Dr. Angelillo's report was introduced at the motion for new trial hearing. The evaluation noted that the defendant had no psychiatric history prior to this incarceration. In the evaluation, Dr. Angelillo found that the defendant suffered from various mental problems. However, Dr. Angelillo made no finding that the defendant suffered from diminished capacity that would negate the defendant's specific intent to commit the crime.

The granting of a continuance lies within the sound discretion of the trial court, and we will not reverse that decision absent a showing of an abuse of discretion. State v. Schmeiderer, 319 S.W.3d 607, 617 (Tenn. 2010) (citing State v. Odom, 137 S.W.3d 572, 589 (Tenn. 2004)). "'An abuse of discretion is demonstrated by showing that the failure to grant a continuance denied defendant a fair trial or that it could be reasonably concluded that a different result would have followed had the continuance been granted.'" Id. (quoting State v. Hines, 919 S.W.2d 573, 579 (Tenn. 1995)).

Upon review, we cannot conclude that the trial court abused its discretion in denying the defendant's request for a continuance. As noted by the trial court at the motion for new trial, the defendant had three years to develop any sort of diminished capacity defense and had in fact been evaluated by a psychiatrist who determined that such defense could not be sustained. In any event, the results of the second evaluation do not indicate that the denial of a continuance denied the defendant a fair trial or that there was a reasonable probability of a different result had a continuance been granted. Therefore, the defendant cannot show that the trial court abused its discretion on this issue.

## II. Motion to Suppress

On June 16, 2009, the defendant filed a motion to suppress, arguing that his personal clothing items were seized from the hospital and later used for DNA testing in violation of

-11-

his Fourth Amendment rights.

The trial court conducted a hearing on the motion, at which Lieutenant Kedra Lockhart with the Memphis Police Department testified that during her involvement in this case, she learned that an injured person "show[ed] up" at The Med but, because they did not have any information connecting him to this case, he was initially treated as a victim instead of a suspect. Lieutenant Lockhart stated that it was not unusual, and was in fact part of written police policy, to collect the clothing or personal effects of seriously wounded individuals at the hospital particularly when the person was injured by a gunshot or stabbing. Officers collected the injured man's clothing but "not in relation to . . . the shooting where the man was killed. It was under this R&I where we treated this person as a victim."

On cross-examination, Lieutenant Lockhart referenced the Memphis Police Department's crime scene investigation policy and procedure manual, which stated: "In cases of aggravated assault where the victims have been transported to a medical facility, the [c]rime [s]cene investigator should follow up his or her investigation with photographs of injuries or to collect . . . items of clothing."

Officer Gerald Paige with the Crime Response Unit of the Memphis Police Department testified that he was involved in the collection of evidence regarding a shooting between a store clerk and a suspect at 2726 Perkins Road in Memphis where the suspect or victim was taken to The Med. At The Med, Officer Paige retrieved several pieces of clothing and personal items belonging to the defendant, who was known as a victim at the time, as well as personal items belonging to another person. Officer Paige said that it was not unusual for him to collect clothing from The Med that belonged to an injured victim or suspect.

On cross-examination, Officer Paige elaborated that an employee of The Med handed him the property, and he did not know from where he or she retrieved it. He admitted that he did not ask the defendant whether he could take the defendant's property.

The defendant testified that his clothing and other property were taken from him at The Med without his permission the night he was injured. He asked that his property not be taken from him and, after he was released, requested that his property be returned to him. He did not know who took his property. On cross-examination, the defendant admitted that he had surgery at the hospital, but then he elaborated that "[t]hey didn't open [him] up. . . . [He] was conscious all the time." In any event, the hospital staff removed his clothing, and he did not know what happened to it thereafter.

Officer Ashton Britton with the Memphis Police Department testified that in the

-12-

course of his duties, he had been to the emergency room at The Med and collected personal items from a victim or someone receiving treatment. Officer Britton explained that, on such occasions, he usually received the items from hospital staff, and they would be packaged in a clear plastic bag. He had never personally taken items off a victim and had never received items from anyone other than medical staff.

Dr. Louis Magnotti testified that he was one of the attending trauma surgeons at The Med but said he did not have anything to do with the defendant's case. Dr. Magnotti looked at the defendant's medical records from The Med and noted that his clothing was cut off, which was the typical practice to facilitate the care of a shooting victim. He explained that if someone were admitted with two gunshots, all of the person's clothing would be cut off and collected by a healthcare provider, then recorded and bagged in a clear plastic bag. Dr. Magnotti added that hospital policy dictated that only healthcare providers were allowed in the trauma room until the initial resuscitation of the patient was over or the patient had died.

On cross-examination, Dr. Magnotti stated that all of a patient's belongings are recorded, logged, and placed in a sealed container. He agreed that the belongings were treated this way because the items were the individual's personal property and were to be kept private from others.

In ruling on the motion to suppress, the trial court observed that the defendant was not a suspect at the time he presented at the hospital and that the hospital staff, per its policy, made the decision to turn the items of clothing and other belongings removed from the defendant over to the police because the defendant appeared to be the victim of a shooting. The court said that there was no governmental action involved in seizing the defendant's belongings, and the Fourth Amendment only limited intrusions by law enforcement. Relying on State v. Cowan, 46 S.W.3d 227 (Tenn. Crim. App. 2000), the court also observed that there can be no reasonable expectation of privacy "when a person is presented to a trauma unit to have bullets taken from his person."

When this court reviews a trial court's ruling on a motion to suppress evidence, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998). The findings of a trial court in a suppression hearing are upheld unless the evidence preponderates against those findings. See id. However, the application of the law to the facts found by the trial court is a question of law and is reviewed *de novo*. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001); State v. Crutcher, 989

-13-

S.W.2d 295, 299 (Tenn. 1999); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect individuals against unreasonable searches and seizures. See U.S. Const. amend. IV; Tenn. Const. art. I, § 7. "These constitutional provisions are designed to 'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'" Keith, 978 S.W.2d at 865 (quoting Camara v. Municipal Court, 387 U.S. 523, 528 (1967)). A search or seizure conducted without a warrant is presumed unreasonable, and evidence obtained as a result will be suppressed "unless the prosecution demonstrates by a preponderance of the evidence that the search or seizure was conducted pursuant to an exception to the warrant requirement." Id. (citations omitted).

Upon review of this issue, we conclude that the defendant's argument regarding suppression of his clothing and the results obtained from the testing of his clothing is moot. The record shows that the State obtained a search warrant, which is unchallenged by the defendant, and thereby obtained the defendant's DNA. The defendant's DNA tied the defendant to the scene. At oral argument, defense counsel suggested that the defendant's unlawfully obtained clothing was essentially the basis for the search warrant obtained by the State. However, it does not appear that the search warrant is in the record, and there is no proof in the record as to the basis for the search warrant. It further does not appear that the defendant ever contested the legality of the search warrant, which we presume that the warrant would have been contested had there been a basis for contesting it. Therefore, the defendant is not entitled to relief on this issue because the defendant was tied to the scene by lawfully obtained evidence.

### III. Surveillance Video

The defendant raises several errors regarding the trial court's admission of the surveillance videotape into evidence. He asserts that the video lacked a proper foundation and was never authenticated. He claims that the authentication by Sergeant Sloan was insufficient because Sergeant Sloan was not present during the shooting nor was he aware of "the keeping of the tapes by the store owner in the ordinary course of business." The defendant further asserts that after the tape was admitted, the court allowed irrelevant and prejudicial sound portions of the video to be played. He maintains that the only relevant portion of the videotape was the actual shooting of the victim, but, instead, the video was allowed to continue playing, displaying "a series of irrelevant and prejudicial screams and moans."

-14-

Proffered evidence must be authenticated or identified as a condition precedent to admissibility. Tenn. R. Evid. 901(a). This requirement is satisfied "by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Id. Authentication may be established by the testimony of a witness with knowledge that a matter is what it is claimed to be. Id. R. 901(b)(1). The trial court is the "arbiter of authentication issues," and the court's discretion will not be disturbed absent clear mistake. Tenn. R. Evid. 901, Advisory Commission Cmts.; State v. Mickens, 123 S.W.3d 355, 376 (Tenn. Crim. App. 2003).

As to the authentication of the videotape, the trial court found that Sergeant Sloan's testimony served to authenticate that the video in question was the video recovered from the crime scene on December 20, 2005. The court noted Sergeant Sloan's testimony that, upon arriving at the scene, he checked to see whether a surveillance video was available and that a person purporting to be the store owner's wife telephoned and he told her to have the store owner come to the store so he could view the videotape. Sergeant Sloan testified that the purported owner arrived, they reviewed the videotape, and he identified the videotape "as the tape that he picked up from Citgo on December 20th, 2005[.]" The trial court observed that the information on the tape was consistent with and supplemented the testimonies of Tina Watkins and Officer Bennie Washington. In addition, the defendant later testified that he was the gunman seen on the video shooting the victim. In light of this evidence, we cannot conclude that the trial court made a clear mistake in determining that the video "in question [wa]s what its proponent claim[ed]."

Tennessee Rule of Evidence 401, which governs the initial issue of admissibility, requires the trial court to determine whether the proffered evidence is relevant. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Tennessee Rule of Evidence 403 provides that, even if relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. While it can be said that photographs of crime victims who suffer serious bodily injury are prejudicial by their very nature, a prejudicial photograph is not per se excludable. What is excluded is evidence which is unfairly prejudicial, in other words, evidence which has an undue tendency to suggest a decision on an improper basis, frequently, though not necessarily, an emotional one. State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978).

As to the relevancy and prejudicial effect of the post-shooting portion of the videotape, the trial court found that whatever transpired after the shooting would be relevant to the State's allegation of premeditated murder in count two. In particular, the court noted that the video showed, as indicative of premeditation, that the defendant failed to render aid

or call 911 to report the crime. The court observed that the video was not particularly gruesome or horrifying. The court concluded that the prejudicial effect of the video did not substantially outweigh its probative value.

We cannot conclude that the trial court abused its discretion in reaching this decision. As noted by the trial court, what transpired after the shooting was relevant to the issue of premeditation, specifically that the defendant rendered no aid to the victim. The post-shooting portion of the video also established that the crime scene was not altered or changed in any way until the discovery of the victim. This court has previously found that because the State had the burden of proof, the trial court did not abuse its discretion in allowing twenty minutes of a trooper in-car camera to be played to the jury in which the trooper was shown lying dead in the road. See State v. Orlando Daniel Garcia, No. W2009-00164-CCA-R3-CD, 2010 WL 3766942, at *8 (Tenn. Crim. App. Sept. 28, 2010), perm. to appeal denied (Tenn. Mar. 9, 2011). Moreover, that the jury was unable to reach a verdict on count one of the indictment indicates that the jury was not unduly swayed by emotion caused from watching the video. Thus, even if it were error for the post-shooting portion of the videotape to be shown to the jury, such error had no impact on the verdict. See Tenn. R. App. P. 36(b).

## IV. Identity of Victim

The defendant argues that the State failed to establish the identity of the dead person. He asserts that no one actually testified that the deceased was "Abdiaziz Ali," the victim named in the indictment, and the thirteen various forms of identification recovered from the deceased's belongings were in six different names. He also points out that two exhibits of body fluid samples recovered from the scene noted two different dates of birth for the victim, and those dates were different than the date of birth listed on two of the forms of identification recovered from the deceased.

"'Corpus delicti' literally means the body of the crime." State v. Ellis, 89 S.W.3d 584, 600 (Tenn. Crim. App. 2000). Two elements, which must be proven by the State beyond a reasonable doubt, make up the corpus delicti: "(1) That a certain result has been produced, and (2) That the result was created through criminal agency." State v. Ervin, 731 S.W.2d 70, 71-72 (Tenn. Crim. App. 1986); see Ellis, 89 S.W.3d at 600. "The evidence to establish the corpus delicti in cases of homicide must show that the life of a human being has been taken, which question involves the subordinate inquiry as to the identity of the person charged to have been killed[.]" Bolden v. State, 203 S.W. 755, 755 (Tenn. 1918). In addition to any confession by the defendant, some corroborating evidence is required to establish the corpus delicti of the offense charged. State v. Smith, 24 S.W.3d 274, 281 (Tenn. 2000). However, when the defendant has made a confession, the corroborative

evidence "need not be as convincing as the evidence necessary to establish a corpus delicti in the absence of any confession." Ricketts v. State, 241 S.W.2d 604, 606 (Tenn. 1951). Whether the State has sufficiently established the corpus delicti is primarily a jury question. State v. Jones, 15 S.W.3d 880, 891 (Tenn. Crim. App. 1999).

At the motion for new trial, the trial court noted that even though the victim "may have had different identifications on him . . . under other names other than Ali, but there is no doubt that the person for whom [the defendant] was convicted of killing is, in fact, dead[.]" The court observed that Tina Watkins knew the victim as a result of her regular visits to the store and that there was sufficient proof that the deceased was Abdiaziz Ali despite the fact he had other identifications on him.

Tina Watkins testified that she was a regular customer of the Citgo store. On the night of the shooting, Watkins entered the store and discovered the store clerk wounded, but alive. She called 911 and remained until the police officers arrived. Watkins identified a photograph taken from the Virginia driver's license of Ali Abdiaziz as the Citgo store clerk whom she discovered that night. Officer Bennie Washington testified that he responded to the scene where he found the store clerk lying on the floor, having been shot. Officer Washington called for an ambulance, which arrived to transport the victim to the hospital.

Officer Gerald Paige testified that he responded to the hospital where he collected, among other things, the victim's wallet containing multiple forms of identification. Although several pieces of identification bore different names, six of the identifications bore the name Ali Abdiaziz. Only three of the identifications collected from the victim had photographs on them, and each of those was in the name of Ali Abdiaziz and appeared to have the same person in the photographs. One of the photograph identifications was the Virginia driver's license, which contained the photograph that Watkins was shown to identify the victim. In addition, a check from Night and Day Food Mart made out to Ali Abdiaziz was in the victim's wallet. Dr. Funte testified that an autopsy was performed on a subject identified as Abdiaziz Ali on December 20, 2005. Various photographs were taken of the deceased, and those were entered into evidence at the trial. Dr. Funte testified that the victim died of multiple gunshot wounds. Moreover, the defendant admitted that he was the man shown on the surveillance video shooting the store clerk. In light of the sum of this evidence, we conclude that the State met its burden of proof regarding corpus delicti.

However, as conceded by the State, the defendant's argument possibly raises the issue of a variance between the indictment and the proof at trial because the name included in the indictment was Abdiaziz Ali, but the bulk of the proof identified the victim as Ali Abdiaziz.

A variance arises when the proof presented at trial departs from the allegations in the

indictment.  <u>State v. Keel</u>, 882 S.W.2d 410, 416 (Tenn. Crim. App. 1994).  Before a variance will be deemed fatal to a prosecution, it must be both material and prejudicial.  <u>State v. Moss</u>, 662 S.W.2d 590, 592 (Tenn. 1984).  In general, a variance between an indictment and the proof at trial

> is not fatal if (1) the defendant is sufficiently informed of the charges levied against him so that he can adequately prepare for trial and, (2) the defendant is protected against a subsequent prosecution for the same offense based on double jeopardy grounds.  The variance is not to be regarded as material when the indictment and proof substantially correspond.  A material variance occurs only if the prosecutor has attempted to rely at the trial upon theories and evidence that were not fairly embraced in the allegations made in the indictment.

<u>State v. Mayes</u>, 854 S.W.2d 638, 640 (Tenn. 1993) (citations omitted).  As long as the defendant is not misled at trial, any variance is not considered to be a basis for reversal.  <u>Johnson v. State</u>, 596 S.W.2d 97, 103 (Tenn. Crim. App. 1979).

In this case, the indictment listed the victim's name as Abdiaziz Ali and charged that the defendant killed Abdiaziz Ali on December 20, 2005.  The proof at trial showed that the victim had six forms of identification bearing the name Ali Abdiaziz.  The proof at trial also showed that the victim and the defendant engaged in a gun battle on December 20, 2005.  Given these facts, we cannot conclude that the transposition of the victim's first and last names on the indictment misled the defendant of the charges he had to defend against or failed to protect him against subsequent prosecution for the same offense based on double jeopardy grounds.

### V. Closing Argument

The defendant argues that the State's rebuttal argument improperly shifted the burden of proof from the State to the defendant.

During the defendant's closing argument, defense counsel argued that the incident at the Citgo was not an attempted robbery.  He emphasized that no money was taken and that the defendant had a regular job and was not in need of money.  In rebuttal, the prosecutor pointed out that there was no objective proof of the defendant's employment by stating, "He's gainfully employed; he's making all this money - of course, that's what he says.  No employer or past employer has come in and said he worked a certain amount of time[.]"  Defense counsel objected, and the court ruled that the State was responding to the defense arguments.

Tennessee courts "have traditionally provided counsel with a wide latitude of discretion in the content of their final argument" and trial judges with "wide discretion in control of the argument." State v. Zirkle, 910 S.W.2d 874, 888 (Tenn. Crim. App. 1995). A party's closing argument "must be temperate, predicated on evidence introduced during the trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Middlebrooks, 995 S.W.2d 550, 557 (Tenn. 1999). The five generally recognized areas of prosecutorial misconduct in closing argument occur when the prosecutor intentionally misstates the evidence or misleads the jury on the inferences it may draw from the evidence; expresses his or her personal opinion on the evidence or the defendant's guilt; uses arguments calculated to inflame the passions or prejudices of the jury; diverts the jury from its duty to decide the case on the evidence by injecting issues broader than the guilt or innocence of the accused under the controlling law or by making predictions on the consequences of the jury's verdict; and intentionally refers to or argues facts outside the record, other than those which are matters of common public knowledge. State v. Goltz, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003).

For a defendant to be entitled to a new trial on the basis of allegedly improper remarks during the closing argument, they must be shown to have prejudiced the case by affecting the jury's verdict. Middlebrooks, 995 S.W.2d at 559. In determining whether this occurred, we consider the following factors: (1) the conduct viewed in light of the circumstances and facts in the case; (2) any curative measures taken by the trial court and the prosecution; (3) the prosecutor's intent in making the improper statements; (4) the cumulative effect of the prosecutor's statements and other errors in the record; and (5) the relative strength and weakness of the case. Id. at 560.

Upon review, we discern no error in the trial court's overruling the defendant's objection to the State's rebuttal argument. The State's argument was clearly in response to the defendant's repeated emphasis in closing that he had no motive to commit a robbery because he was gainfully employed and earned decent compensation. "Where the criminal defendant raises an issue in his defense, he cannot complain of references to the issue by the prosecution, or argument on that issue, so long as the argument is fairly warranted by the facts and circumstances of the case." State v. Sutton, 562 S.W.2d 820, 823-24 (Tenn. 1978).

In any event, the defendant cannot show that he was prejudiced by the rebuttal argument of the State because the jury was unable to reach a verdict on the felony murder count and a mistrial was declared, and evidence concerning the defendant's financial situation was clearly more applicable to the charge of murder during the attempted perpetration of a robbery and not the charge of premeditated murder.

# VI. Sufficiency of the Evidence

The defendant challenges the sufficiency of the convicting evidence, arguing that there was no evidence that the killing was intentional and premeditated and, again, that the State failed to prove that the person named in the indictment was the person actually killed. When the sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

First degree murder is "[a] premeditated and intentional killing of another [.]" Tenn. Code Ann. § 39-13-202(a)(1) (2006). "Premeditation" is defined in our criminal code as

an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d).

Whether premeditation exists in any particular case is a question of fact for the jury to determine based upon a consideration of all the evidence, including the circumstantial evidence surrounding the crime. See State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000); State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998). Facts from which the jury may infer premeditation include the defendant's declaration of an intent to kill the victim; the use of a deadly weapon upon an unarmed victim; the establishment of a motive for the killing; the particular cruelty of the killing; the infliction of multiple wounds; the defendant's procurement of a weapon, preparations to conceal the crime, and destruction or secretion of evidence of the killing; and the defendant's calmness immediately after the killing. State v. Jackson, 173 S.W.3d 401, 409 (Tenn. 2005); State v. Thacker, 164 S.W.3d 208, 222 (Tenn. 2005); State v. Leach, 148 S.W.3d 42, 54 (Tenn. 2004); State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000); Bland, 958 S.W.2d at 660.

The evidence in this case, specifically the store surveillance video and Dr. Funte's testimony, when viewed in the light most favorable to the State, establishes that the defendant killed the victim "after the exercise of reflection and judgment." The video showed that the defendant and two confederates walked into the Citgo store wearing hoods and masks. The defendant removed his gun from his holster, and his two confederates left the store. The defendant approached the victim, and the two exchanged gunfire while in a standing position. The victim fell down and the defendant started to leave the store. However, the defendant removed his hood, returned to the victim, and fired one more shot as the victim tried to move away. It appears as though the victim grabbed his torso after the last shot.

Dr. Funte testified that the gunshot wound to the chest caused "pretty major injuries," including damage to the pancreas, small intestine, liver, inferior vena cava, and kidney and that the trajectory was from up to down. Given the angle of the chest wound and the video showing the victim grabbing his torso after the last shot, a rational trier of fact could conclude that the defendant, instead of leaving the store, returned to the victim to fire a final shot to ensure his death. Moreover, the defendant failed to render aid to the victim, which

-21-

permits the jury to infer that the defendant's actions were premeditated. See State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000). It was within the province of the jury to reject the defendant's assertion that the gun accidentally fired when he returned to the victim to remove the gun from his hand. In addition, as already addressed above, there was sufficient proof that "the individual in the indictment or in the video had actually been killed."

## VII. Jury Charge

The defendant argues that the "acquittal-first" instruction charged by the court precluded the jury from considering lesser-included offenses, specifically voluntary manslaughter. He asserts that because voluntary manslaughter requires that one act intentionally or knowingly plus the additional element of in "a state of passion produced by adequate provocation[,] . . . it is theoretically impossible" for the jury to consider the offense of voluntary manslaughter unless it has already found him guilty of a greater offense that only requires that the killing be intentional or knowing but not in "a state of passion."

In this case, the trial court instructed the jury on the indicted offense of first degree murder and the lesser-included offenses of second degree murder, facilitation of first degree murder, facilitation of second degree murder, voluntary manslaughter, facilitation of voluntary manslaughter, reckless homicide, and criminally negligent homicide. The trial court also instructed the jury not to consider the lesser-included offenses unless it first acquitted the defendant of the greater offense.

The defendant acknowledges that sequential offense instructions are approved by the Tennessee Supreme Court, see State v. Davis, 266 S.W.3d 896 (Tenn. 2008), but he urges that "in practicality [such instructions are] flawed when it comes to the theory behind the instruction." In Davis, our supreme court held that

> where a criminal defendant is entitled to jury instructions on lesser-included offenses, the trial court shall instruct the jury to consider the offenses in order from greatest to least within each count of the indictment and that it shall not proceed to consider any lesser-included offense until it has first made a unanimous determination that the defendant is not guilty of the immediately-preceding greater offense.

Davis, 266 S.W.3d at 910. The court additionally endorsed the giving of sequential instructions as a matter of policy. Id. at 905-08. We are bound to follow the dictates of our supreme court, which has determined that sequential jury instructions are appropriate and constitutional. It is not the province of this court to second-guess that decision. Moreover, as indicated by the court in Davis, the jury, although not doing so explicitly, simultaneously

-22-

considers lesser-included offenses supported by the proof when it considers the greater offense, at least with respect to lesser-included offenses whose statutory elements are included in the statutory elements of the greater offense which is the case here. Id. at 904. Thus, the jury knew that it could acquit on a more serious charge in favor of convicting on the lesser offense of voluntary manslaughter but chose not to do so. The defendant is not entitled to relief on this issue.

## VIII.  Verdict Form

The defendant lastly argues that the verdict form used by the trial court was inconsistent in that it emphasized the necessity for a unanimous verdict of not guilty but did not emphasize the necessity for a unanimous verdict of guilty. He asserts that the instructions misled the jury into thinking it could return a less than unanimous guilty verdict.

We initially note that although the defendant objected to the verdict form on the basis of its providing for "acquittal-first," it does not appear that the defendant ever objected on the basis of inconsistency regarding a unanimous verdict and has therefore waived review of this issue. See Tenn. R. App. P. 36(a).

Waiver notwithstanding, the defendant is not entitled to relief on this issue. Defendants have a "constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986)). When reviewing challenged jury instructions, we must look at "the charge as a whole in determining whether prejudicial error has been committed." In re Estate of Elam, 738 S.W.2d 169, 174 (Tenn. 1987); see also State v. Vann, 976 S.W.2d 93, 101 (Tenn. 1998). A charge is prejudicially erroneous "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." Vann, 976 S.W.2d at 101; State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997).

In its opening instructions to the jury, the trial court informed the jury that it could not find the defendant guilty unless it determined, unanimously, that the State had proven the essential elements of the crime beyond a reasonable doubt. In its final written instructions to the jury, the court stressed that "[a]ny verdict . . . reach[ed] in the jury room, whether guilty or not guilty, must be unanimous." A page and a half later, the instructions provided that if the jury found the defendant guilty, it should return a verdict of guilty, but if it unanimously found him not guilty, it should then consider lesser-included offenses. The instructions further provided that if the jury unanimously found the defendant not guilty of any lesser-included offenses, then it should return such verdict, but if it unanimously found

-23-

him guilty of any lesser-included offense, then that would be its verdict. In its final oral instructions to the jury, among other things, the court stressed, "And after you've deliberated on this case . . . whether it's guilty, not guilty, or guilty of lesser-included offenses, your verdict has to be unanimous." Upon our review, it is clear that the totality of the trial court's instructions to the jury and the attendant verdict form provided that the jury's decision, whether guilty or not guilty, must be unanimous. Thus, the defendant is not entitled to relief on this issue.

## **CONCLUSION**

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE